## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **APRIL M. BAKER** | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | 2:11cv15 |
| v. | ) | **Electronic Filing** |
| | ) | |
| **COMMISSIONER OF**, | ) | |
| **SOCIAL SECURITY** | ) | |
| | ) | |
| Defendant | ) | |

## <u>MEMORANDUM OPINION</u>

September 22, 2011

## I.    INTRODUCTION

April M. Baker ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking

review of the final determination of the Commissioner of Social Security ("Defendant" or

"Commissioner") denying her application for disability insurance benefits ("DIB") and

supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 401-433, 1381 - 1383f ("Act").  This matter comes before the court on cross motions

for summary judgment.  (ECF Nos. 9, 11).  The record has been developed at the administrative

level.  For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED, and

Defendant's Motion for Summary Judgment is GRANTED.

## II.    PROCEDURAL HISTORY

Plaintiff filed for DIB and SSI with the Social Security Administration July 25, 2007, claiming an inability to work due to disability beginning June 2, 2007. (R. at 125 – 33)[1]. Plaintiff was initially denied benefits on October 5, 2007. (R. at 75 – 92). A hearing was scheduled for September 30, 2008, and Plaintiff appeared to testify represented by counsel. (R. at 7). A vocational expert also testified. (R. at 7). The Administrative Law Judge ("ALJ") issued a decision denying benefits to Plaintiff on November 13, 2008. (R. at 59 – 73). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on December 3, 2010, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 5).

Plaintiff filed her Complaint in this Court on January 10, 2011. (ECF No. 3). Defendant filed his Answer on March 21, 2011. (ECF No. 6). Cross motions for summary judgment followed.

## III.   STATEMENT OF THE CASE

The facts relevant to the present case are limited to those records that were available to the ALJ when rendering her decision. All other records newly submitted[2] to the Appeals Council or this court will not be considered, here, and will not inform the decision of this Court. *See Matthews v. Apfel*, 239 F.3d 589, 592, 594 – 95 (3d Cir. 2001).[3]

---

[1]      Citations to ECF Nos. 7 – 7-7, the Record, *hereinafter*, "R. at __."

[2]      Exhibit 10F; R. at 289 – 97.

[3]      The Appeals Council may decline review of a claimant's case when the ALJ's decision is not at odds with the weight of the evidence on record. *Matthews*, 239 F.3d at 592. In such a case, a district court can only review that evidence upon which the ALJ based his or her decision. *Id.* at 594 – 95. As a result, new evidence presented by a claimant to the Appeals Council, but not reviewed, is not within the purview of a district court when judging whether substantial

A.  <u>General Background</u>

Plaintiff was born February 18, 1960, and was forty eight years of age at the time of her administrative hearing.  (R. at 125, 129).  Following graduation from high school, Plaintiff never received any post-secondary education or training.  (R. at 13).  Her last two jobs were as a kitchen cook, which position she held for approximately nine years, and as a deli clerk, which position she held approximately one year.  (R. at 13 – 14).  Plaintiff had been living in a trailer home for the past two years with her fiancé.  (R. at 11).  Plaintiff had a number of children, and eleven grandchildren.  (R. at 12).  Her grandchildren visited her occasionally, and one of her daughters visited her every day.  (R. at 11 – 12).  Plaintiff's fiancé received social security disability benefits as a result of back-related ailments.  (R. at 12).  Plaintiff helped to provide care for him on a daily basis.  (R. at 12).

B.  <u>Treatment History</u>

In April of 2006, Joel E. Nystrom, M.D. – Plaintiff's primary care physician – examined Plaintiff for a regular check-up.  (R. at 244).  He indicated that Plaintiff's mood was "pretty good."  (R. at 244).  He noted her complaints of achy, localized, fibromyalgia-type pain.  (R. at 244).  She complained about her hip in particular, but Dr. Nystrom found Plaintiff's hip had a full range of motion.  (R. at 244).  She did exhibit mild discomfort in her lower back and shoulders.  (R. at 244).  However, no other trigger points were found, and Plaintiff's knees were non-tender.  (R. at 244).  Dr. Nystrom recommended home exercise and walking.  (R. at 244).  He also increased her prescription Zoloft dosage for her anxiety and depression.  (R. at 244).  At

evidence supported an ALJ's determination.  *Id*.  Such is the case at present.  Additionally, Plaintiff failed to make the required showing under *Szuback v. Secretary of Health and Human Services*, 745 F.2d 831 (3d Cir. 1984), for remand to reconsider the case in light of newly submitted evidence not considered by the ALJ when making her decision.  Therefore, the case will not be remanded for this purpose, and Exhibit 10F (R. at 289 – 97) will not be discussed.

a check-up in March of 2007, Dr. Nystrom found Plaintiff had not been taking her prescribed Zoloft for two months due to insufficient funds. (R. at 243). As a result, he noted an uptick in her anxiety and panic attacks. (R. at 243).

In May of 2007, Plaintiff visited Dr. Nystrom complaining of a fear of large crowds and big stores. (R. at 240, 253). She stated that she would go to Wal-Mart, but only at night when it was quieter. (R. at 240, 253). Plaintiff reported that she was still capable of working as a deli clerk. (R. at 240, 253). She also informed the doctor that she experienced low back and hip pain, with occasional pain in the upper back and chest. (R. at 240, 253). Minimal muscular tenderness was noted upon examination. (R. at 240, 253). Straight leg raising was negative. (R. at 240, 253). Her arms and legs were non-tender. (R. at 240, 253). Dr. Nystrom believed Plaintiff had strained her low back by working on her feet all day. (R. at 240, 253). He noted some pain and stiffness in her hands, and attributed this to mild carpal tunnel syndrome. (R. at 240, 253). He diagnosed mild degenerative arthritis, as well. (R. at 240, 253). He noted that prescription Zoloft had been providing Plaintiff was some benefit for her anxiety. (R. at 240, 253). Yet, in July of 2007, Plaintiff complained to Dr. Nystrom of feeling panicky and not wishing to leave her house. (R. at 239). He noted that she had not sought any counseling. (R. at 239). He diagnosed generalized anxiety disorder with panic attacks. (R. at 239).

Plaintiff was seen in the emergency department of UPMC Horizon Hospital in Greenville, Pennsylvania on August 9, 2007, for complaints of moderate, sharp upper back pain between her shoulder blades. (R. at 212 – 35). Plaintiff claimed that breathing, coughing, and moving were painful. (R. at 212 – 35). An EKG and chest x-ray returned normal results. (R. at 212 – 35). Plaintiff was diagnosed with acute myofascial strain, and was discharged following improvement in her condition. (R. at 212 – 35). Her extremities were noted to be non-tender,

with a full range of motion.  (R. at 212 – 35).  Her grip was normal and symmetrical, and her reflexes were normal, as well.  (R. at 212 – 35).  Plaintiff was provided a prescription for Tylenol with codeine.  (R. at 212 – 35).

While at the hospital, Plaintiff was asked if she was feeling sad or lonely, or if she was confined to her home with limited contact with others.  (R. at 212 – 35).  She replied that she was not.  (R. at 212 – 35).  She did not wish to talk to anyone about her feelings, either.  (R. at 212 – 35).  She was noted to have a history of anxiety.  (R. at 212 – 35).

Plaintiff followed up with Dr. Nystrom subsequent to her emergency room admission.  (R. at 238, 252).  Dr. Nystrom noted the normal EKG and x-ray results.  (R. at 238, 252).  He also noted Plaintiff's complaints of intermittent pain in the upper and lower back, occasionally moving up the right side of her neck and into her jaw.  (R. at 238, 252).  Sometimes the pain moved into her right anterior chest.  (R. at 238, 252).  Upon examination, Dr. Nystrom found only slight muscle tenderness, full range of motion in the neck, and regular heart rhythm.  (R. at 238, 252).

On September 17, 2007, Plaintiff was examined by Dr. Nystrom, and reported that the Zoloft prescribed for her anxiety was helping, and that she was feeling better.  (R. at 237, 251).  She still preferred not to go out in public places with crowds.  (R. at 237, 251).  Plaintiff continued to complain of lower back and buttock pain; however, Dr. Nystrom noted past x-rays of her back and hips were normal.  (R. at 237, 251).  He also found that she had good range of motion in her lower back, with some tenderness along the sacroiliac area of her spine, but nowhere else.  (R. at 237, 251).  Dr. Nystrom diagnosed Plaintiff with generalized anxiety disorder, depression with anxiety, and occasional panic attacks.  (R. at 237, 251).

At an appointment with Dr. Nystrom in October of 2007, Plaintiff reported that prescription Klonopin had been helping with her leg pain. (R. at 236, 250). Dr. Nystrom was considering increasing the dosage. (R. at 236). Plaintiff was able to go into public more, and had only had one "panicky spell" since her last visit. (R. at 250). Plaintiff reported no side effects from her Zoloft. (R. at 250). Dr. Nystrom increased her dosage on Zoloft, as well. (R. at 250). In November and December of 2007, Plaintiff experienced no anxiety or panic attacks when at home, but would reportedly still have difficulty with crowds in public places. (R. at 249). It was noted that she had an appointment for an evaluation by a counselor. (R. at 249). Medication management for Plaintiff's fibromyalgia symptoms was to be continued. (R. at 249).

Several months passed before Plaintiff's last appointment with Dr. Nystrom on the record, in July of 2008, and it was noted that Plaintiff complained of back pain, and difficulty with both sitting and standing. (R. at 186). However, Dr. Nystrom described this as a "new problem." (R. at 186). Upon examination, Plaintiff's straight leg raising was negative, she exhibited minimal tenderness in her calves, and reflexes in her knees and ankles were intact. (R. at 186). Dr. Nystrom considered Plaintiff's discomfort to be fibromyalgia-type pain. (R. at 186). He indicated that he would order x-rays if her lower back continued to be a problem. (R. at 186). Plaintiff informed Dr. Nystrom that she was planning to go away for the summer to visit a friend for a while. (R. at 186). No other physical issues were discussed in the notes. (R. at 186). Plaintiff was noted to be taking Klonopin and Gabapentin for her fibromyalgia. (R. at 186).

C. Functional Assessments

On September 17, 2007, Dr. Nystrom completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) on behalf of Plaintiff. (R. at 267 – 74). In it, he indicated that Plaintiff's appearance, behavior, speech, affective expression, appropriateness,

6

stream of thought, thought content, intelligence, concentration, orientation, memory, impulse control, judgment, and insight were all normal.  (R. at 267 – 74).  He further indicated that Plaintiff had no difficulties performing daily activities on a sustained basis.  (R. at 267 – 74).  She did have difficulty getting along with/interacting with family, friends, neighbors, co-workers, employers, and the general public because of her issues with crowds.  (R. at 267 – 74).  However, her concentration, persistence, and pace would not be affect by her mental state.  (R. at 267 – 74).

Dr. Nystrom further determined that Plaintiff would have no limitations in her ability to understand, remember, and carry out instructions.  (R. at 267 – 74).  She would have no limitation in the ability to respond appropriately to supervision, co-workers, and work pressures in a work setting.  (R. at 267 – 74).  Yet, Dr. Nystrom did reiterate that Plaintiff would have difficulty dealing with crowds due to her anxiety.  (R. at 267 – 74).

A Psychiatric Review Technique ("PRTF") was completed by state agency consultant Richard Heil, Ph. D. on September 25, 2007.  (R. at 254 – 66).  He found that Plaintiff suffered from Anxiety-Related Disorders, but that the degree of her impairment was not severe.  (R. at 254 – 66).  Dr. Heil indicated that Plaintiff had no limitation in her activities of daily living, had mild limitation in maintaining social functioning and maintaining concentration, persistence, and pace, and had no episodes of decompensation.  (R. at 254 – 66).  Dr. Heil gave controlling weight to the September 17, 2007 report of Dr. Nystrom.  (R. at 254 – 66).

More specifically, he found that the severity of Plaintiff's subjective complaints did not comport with the severity suggested by the objective record evidence.  (R. at 254 – 66).  She would have no difficulty sustaining attention or using appropriate judgment, her psychomotor behavior was normal, her memory and affect were normal, she was only mildly anxious and had

never been hospitalized for a mental condition, she could get along with authority figures without problems, and she could follow directions well. (R. at 254 – 66). Dr. Heil believed that Plaintiff exaggerated her limitations, and that the actual severity of her impairments would not limit her ability to work. (R. at 254 – 66).

On January 7, 2008, Plaintiff underwent a psychological assessment with Pennsylvania licensed psychologist Deborah J. Mikita, M.A. and her student intern Carol Follingstad, M.S. at DJM Psychological Services of Hermitage, Pennsylvania. (R. at 275 – 79). The assessment included a clinical interview, medical record review, and administration of a Clinical Multiaxial Inventory ("MCMI-III"). (R. at 275 – 79). Plaintiff was referred for the assessment by the Mercer County Department of Welfare. (R. at 275 – 79). It was noted that Plaintiff was applying for social security benefits. (R. at 275 – 79).

Plaintiff was indicated as suffering from a history of depression, anxiety, panic attacks, and fibromyalgia. (R. at 275 – 79). At the time she had been prescribed Zoloft, Xanax, Klonopin, and Antivert for treatment. (R. at 275 – 79). Plaintiff was observed to be casually dressed, and had a pleasant appearance. (R. at 275 – 79). She frequently shifted positions in her seat. (R. at 275 – 79). Her gait was normal, but her movements were slow. (R. at 275 – 79). She appeared to be very nervous, but her eye contact was good, and she was polite, well-mannered, and eager to please. (R. at 275 – 79). Additionally, Plaintiffs speech was fluid and easily understood, she was able to answer questions and complete her thoughts, she was able to use abstract ideas, and she did not demonstrate problems with impulsivity or distractibility. (R. at 275 – 79). She did exhibit a need for time to process questions and her thoughts, had some problems with memory which required repetition of questions, and did appear to have problems with concentration. (R. at 275 – 79).

8

Results of the MCMI-III presented Plaintiff as socially timid, self-deprecating, flat or depressive in affect, hesitant to become involved in relationships, and having a desire to sacrifice her own wishes to please others. (R. at 275 – 79). The results indicated that Plaintiff could be depressed, and could be socially uncomfortable and lonely. (R. at 275 – 79). She also may have had poor self-esteem. (R. at 275 – 79). However, the results also implied that Plaintiff may have exaggerated her symptoms, that she was inclined to complain, and that she often felt extremely vulnerable due to turmoil in her life. (R. at 275 – 79). Due to this potential exaggeration, Ms. Mikita suggested that the results of the psychological assessment be interpreted with caution. (R. at 275 – 79).

Plaintiff was diagnosed with panic disorder with agoraphobia, recurrent, severe major depressive disorder, and fibromyalgia. (R. at 275 – 79). Plaintiff's global assessment of functioning[4] ("GAF") score was considered to be 50, although her highest recent score was estimated to be 75. (R. at 275 – 79). It was recommended that Plaintiff see a counselor at least once a week, that she continue to see her doctor on a regular basis, that she seek a home support aide to help her with going into public, that she seek vocational guidance to determine what

---

[4]     The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; of 20 "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *Id.*

types of jobs would be available to her given her fear of public places and panic attacks, and that she consider a job coach to work through her fears in work situations. (R. at 275 – 79). These results were reviewed and approved by Ph. D. licensed psychologist Dr. Scrimenti. (R. at 275 – 79).

Dr. Nystrom again assessed Plaintiff's functional capabilities on January 28, 2008. (R. at 281 – 88). In his evaluation, he indicated that Plaintiff was capable of working only less than sedentary jobs, due to an inability to lift ten pounds with any frequency, inability to sit for long periods, and general inability to meet the requirements of sedentary work on a sustained basis. (R. at 281 – 88). He followed with an assessment of Plaintiff's degree of impairment under the disability listings at 20 C.F.R., Pt. 404, Subpt. P, App'x 1 – specifically 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders). (R. at 281 – 88). Dr. Nystrom concluded that Plaintiff met the requirements for social security benefits according to both listings. (R. at 281 – 88). Dr. Nystrom ended his assessment by noting that Plaintiff had a poor ability to deal with the public, deal with work stress in a usual work setting, and behave in an emotionally stable manner. (R. at 281 – 88). In all other respects, he found her to have good-to-fair capabilities in making occupational adjustments, making performance adjustments, and making personal/social adjustments.

D. Administrative Hearing

Plaintiff testified that she quit her prior employment as a kitchen cook to help her fiancé following a number of back surgeries. (R. at 15). Plaintiff remained unemployed for approximately four or five years. (R. at 15). She returned to the workforce as a deli clerk at a local grocery store. (R. at 15). Plaintiff explained that her psychological problems began at that time. (R. at 15). She quit that position after one year. (R. at 16). Her primary reason for

terminating her employment was anxiety. (R. at 16). She claimed to experience difficulty dealing with customers and being in public places. (R. at 16, 45). Plaintiff indicated that she even began to avoid leaving her home due to her anxiety. (R. at 16). She stated that she spent up to four whole days a month crying at her home while alone. (R. at 19). Plaintiff could not point to any particular cause for her anxiety, simply that she no longer wished to deal with other people. (R. at 17). She alleged having two anxiety attacks while working as a deli clerk, prompting her eventual decision to quit. (R. at 18). Plaintiff never again sought work because she did not feel she would be able to manage full-time employment. (R. at 19).

Dr. Nystrom prescribed only Zoloft for treatment of Plaintiff's anxiety and depression. (R. at 22). Plaintiff had not sought the help of a psychiatrist or counselor for her psychological conditions, and stated that she had never considered doing so. (R. at 27). Further, she did not believe that it would help her, and also noted that she would have difficulty attending any sort of counseling due to her and her husband sharing a car. (R. at 27). Yet, in response to questioning by the ALJ, Plaintiff then acknowledged that sharing a car would not likely be a general barrier to treatment, because her husband did not work and could drive her to appointments as he had for her administrative hearing. (R. at 27 – 28).

Plaintiff did not believe that her anxiety had worsened over the past year. (R. at 30). She stated that her medication kept her "pretty mellow," and had helped her "a lot." (R. at 30, 47). She went on to state that because of her medication, she was "pretty good," and "not stressed out a lot when a lot of people are around." (R. at 30, 47). Plaintiff then backtracked and stated that she still became very anxious around crowds in public, but that she could tolerate groups of friends and relatives at her home for short periods of time. (R. at 30). She went on to describe throwing a recent birthday party for her fiancé at her home, hosting approximately thirty people.

11

(R. at 30).  Yet, according to Plaintiff, they did not stay for more than an hour due to her anxiety.  (R. at 31).

In response to questioning by the ALJ, Plaintiff further explained that she could handle groups of up to thirty people in public before becoming overwhelmed with anxiety, and that her anxiety could be affected by the size of the room she was in, and how well she knew the people around her.  (R. at 31).  Plaintiff explained that she had family and friends that came to her house for visits, but that she did not often visit others.  (R. at 35 – 36).  Regardless of the social situation, however, Plaintiff stated that she no longer liked to communicate or be around other people for long periods of time: "I want to be left alone."  (R. at 32).  Even when alone, Plaintiff claimed to feel anxiety at times.  (R. at 43).

In addition to her anxiety, Plaintiff averred that her diagnosed fibromyalgia prevented her from performing full-time work.  (R. at 20).  She described being in constant pain, particularly in her lower back, hips, and knees.  (R. at 20).  Her pain varied, but she did not receive prescription pain medication for treatment, instead relying upon Tylenol and ibuprofen for relief.  (R. at 21 – 22).  She felt that the over-the-counter medications were ineffective, however.  (R. at 21 – 22).  Initially, Plaintiff stated that Dr. Nystrom did not provide her with prescription pain medications because of the other medications she was taking; however, she later claimed that he felt she would become addicted because of the chronic nature of her pain.  (R. at 22 – 23).  Dr. Nystrom did provide her with a prescription for Neurontin to control any swelling she might experience.  (R. at 21).  Plaintiff testified that over the past year, her fibromyalgia had worsened.  (R. at 28, 44).

Plaintiff alleged that her fibromyalgia had become so debilitating that she often fell without explanation.  (R. at 28).  She complained that she had collapsed twice in the previous

three weeks. (R. at 28). She claimed that she had fallen – on average – twice a week for the previous three months. (R. at 29). Prior to that, she had fallen only twice a month. (R. at 46). She stated that she informed Dr. Nystrom about her falling, and that he opined that it was the result of weakened joints caused by worsening fibromyalgia. (R. at 29). Dr. Nystrom did not prescribe any assistive devices for walking. (R. at 30).

The ALJ questioned Plaintiff about the lack of notations in Dr. Nystrom's findings indicating that Plaintiff had a history of falls. (R. at 29). Plaintiff responded that the falling had only gone on for approximately one month, and that she would not see Dr. Nystrom again to report the falling until the month following her hearing. (R. at 29). The ALJ then reminded Plaintiff that she initially testified about falling for the last three months, and that Dr. Nystrom did, in fact, know about her condition. (R. at 29). Plaintiff replied that he did know, but that he must not have recorded her complaints in his medical notes. (R. at 29).

The ALJ asked Plaintiff about her limitations when walking and standing. (R. at 32). Plaintiff stated that she was often stiff when she first woke in the morning, but that she was able to "walk that off." (R. at 32). She stated that she walked around her trailer park every afternoon. (R. at 32). In terms of specific distances, Plaintiff felt that she could only walk up to five hundred feet at a time. (R. at 32 – 33). Plaintiff felt that she could stand for up to fifteen minutes before requiring a short break to sit. (R. at 33). She could not usually find a comfortable position sitting, however, and often resorted to lying down. (R. at 33 – 34). Allegedly, she could only sit for twenty minutes at a time. (R. at 34). Plaintiff testified that she was able to do yard work such as planting flowers and pulling weeds, for approximately seventeen minutes before needing a rest. (R. at 33, 40). Following extended activity, Plaintiff

stated she would often sit or lie down for long periods – up to an hour-and-a-half. (R. at 42, 48). She might do this twice a day. (R. at 47).

Plaintiff stated that she could lift a gallon of milk, or up to fifteen pounds, for twenty minutes, but that her joints "don't want to hold it." (R. at 34, 41). Vacuuming her floors and cleaning her bathroom could become problematic because bending exacerbated her pain. (R. at 34, 40). She did not have problems with dusting, washing dishes, or cooking, because she could take breaks to sit down. (R. at 34 – 35). Plaintiff testified that as a result of her husband's disabling back condition, she managed most household chores. (R. at 12). Plaintiff claimed that she went shopping for short intervals a couple times a week at a local store. (R. at 35). Plaintiff was capable of driving, and was comfortable traveling to the grocery store approximately twice a week on her own. (R. at 13). Occasionally her husband would drive her farther distances. (R. at 13). Plaintiff would need to rest for fifteen to twenty minutes in between her activities. (R. at 41).

Plaintiff crocheted, watched television, and read for enjoyment. (R. at 36). Despite increased anxiety, Plaintiff did not find herself to be having increased difficulty concentrating, stating that she often could sit and complete puzzle books. (R. at 37). She testified that she could sit for approximately an hour at a time to do these activities, moving around whenever she became uncomfortable in a certain position. (R. at 38). After an hour, she would need to get up and do something else, such as washing dishes or letting her dog go outside. (R. at 38). She stated that her fingers would go numb if she crocheted for more than a half an hour at a time. (R. at 38). If she rested her hands for a few minutes, she was able to continue, however. (R. at 39).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical person of Plaintiff's age, educational background, and work experience could

perform a significant number of jobs in the national economy if limited to unskilled, low stress, light exertional work with a sit/stand option, and not requiring lifting of more than fifteen pounds, working around excessive noise, unprotected heights, or moving machinery, having more than minimal interaction with the general public, co-workers, or groups of seven or more people, more than occasional kneeling or crawling, or working at a fast production rate or pace. (R. at 50).

The vocational expert replied that such a person would be capable of engaging in full-time work as a "photocopying and other business machine operator," with 20,000 positions available in the national economy, or as a "security guard," with 750,000 positions available. (R. at 51). If limited to sedentary positions, the hypothetical person could work as a "surveillance system monitor," with 80,000 positions available, or as a "telemarketer," with 385,000 positions available. (R. at 52). In response to questioning by Plaintiff's attorney, the vocational expert further explained that if the hypothetical person were completely off-task four or more days of the month, would need to lay down twice a day for up to an hour-and-a-half at a time, or would have to take a fifteen to twenty minute break every fifteen to twenty minutes, no full-time jobs would be available in significant numbers in the national economy. (R. at 53 – 54).

## IV.   STANDARD OF REVIEW

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[5] and 1383(c)(3)[6]. Section 405(g) permits a district court to review

---

[5]     Section 405(g) provides in pertinent part:
         Any individual, after any final decision of the [Commissioner] made after a
         hearing to which he was a party, irrespective of the amount in controversy, may
         obtain a review of such decision by a civil action ... brought in the district court of

the transcripts and records upon which a determination of the Commissioner is based, and the court will review the record as a whole. *See* 5 U.S.C. §706. When reviewing a decision, the district court's role is limited to determining whether substantial evidence exists in the record to support an ALJ's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). In short, the court can only test the adequacy of an ALJ's decision based upon the rationale provided; the court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different

---

the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[6]      Section 1383(c)(3) provides in pertinent part:
The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986).

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). The ALJ must utilize a five-step sequential analysis when evaluating whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

17

## V.    DISCUSSION

In her decision, the ALJ concluded that Plaintiff suffered medically determinable severe impairments in the way of fibromyalgia, anxiety (panic attacks), and depression.  (R. at 64). Despite these impairments, the ALJ found Plaintiff capable of engaging in unskilled, low stress, light exertional employment, provided that she be limited to lifting no more than fifteen pounds, have a sit/stand option, be able to change positions as needed, perform no more than occasional kneeling or crawling, be able to avoid excessive noise, unprotected heights, and dangerous machinery, have only minimal interaction with co-workers, the general public, and groups of people greater than seven, and finally, that she not be required to work in a fast paced production environment.  (R. at 66).  Based upon the testimony of the vocational expert, Plaintiff was capable of engaging in a significant number of jobs in the national economy.  (R. at 71 – 72).  As a result, she was found ineligible for DIB or SSI.  (R. at 71 – 72).

In her Motion for Summary Judgment, Plaintiff objects to the decision of the ALJ, claiming that she erred in failing to give medical evidence favoring Plaintiff's position proper weight, and failed to credit Plaintiff's subjective complaints of pain and limitation.  (ECF No. 10 at 5 – 14).  The Commissioner counters that the ALJ's decision was correct in light of inconsistencies within the medical record, and a lack of credibility on the part of Plaintiff.  (ECF No. 12 at 9 – 17).  Substantial evidence would, therefore, support affirmance.  (*Id.*).

The first part of Plaintiff's argument focuses upon the ALJ's treatment of Dr. Nystrom's severe January 17, 2008, assessment of Plaintiff's limitations, and the psychological assessment of DJM Psychological Services.  (ECF No. 10 at 5 – 10).  Plaintiff first contends that the ALJ did not present enough evidence from the record to refute Dr. Nystrom's conclusions that Plaintiff

could only perform less than sedentary work, and met disability listings 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders).

The Court of Appeals for the Third Circuit has held that a treating physician's opinions may be entitled to great weight – considered conclusive unless directly contradicted by evidence in a claimant's medical record – particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F.2d 1348, 1350 (3d Cir. 1987)). However, a showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. *Id.* Further, the determination of disabled status for purposes of receiving SSI – a decision reserved for the Commissioner, only – will not be affected by a medical source simply because it states that a claimant is "disabled," or "unable to work." 20 C.F.R. § 416.927(e).

When discussing the weight to be accorded a physician's opinions, it is not expected that the ALJ's explanation match the rigor of "medical or scientific analysis" a medical professional might provide, but simply that the ALJ be as "comprehensive and analytical as feasible," and provide the factual foundation for his decision and the specific findings that were rejected. *Cotter*, 642 F.2d at 705. The explanation should allow a reviewing court the ability to determine if "significant probative evidence was not credited or simply ignored." *Fargnoli*, 247 F.3d at 42. The ALJ "cannot reject evidence for no reason or for the wrong reason." *Morales v. Apfel*, 255 F.3d 310, 317 (3d Cir. 2000) (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)).

First, with respect to the functional assessment of January 17, 2008 – upon which Plaintiff would like this court to rely – Dr. Nystrom provided a great deal of conclusory

statements, but little explanation for support. The assessment stood in stark contrast not only to the severity of findings within Dr. Nystrom's medical notes, but also to the findings made in a similar assessment by Dr. Nystrom only four months earlier. (R. at 65 – 71). In her discussion, the ALJ demonstrated the inconsistency between Dr. Nystrom's January 17 assessment, generally, and his September 12, 2007 assessment, as well as the objective medical evidence on record. (R. at 65 – 71). Still, the ALJ did give weight to those less severe findings within the January 17 assessment which did comport with prior evidence on record. (R. at 65 – 71).

Further, in assessing Plaintiff's eligibility for benefits at Step 3, the ALJ rejected Dr. Heil's determination that Plaintiff did not have severe impairments, but nevertheless found that – consistent with Dr. Nystrom's findings as a whole and his assessment from September 12 – Plaintiff was not limited enough to qualify for benefits under listings 12.04 and 12.06. (R. at 65 – 71). While Dr. Nystrom later contradicted his September 12 findings by determining that Plaintiff was disabled under 12.04 and 12.06, the ALJ was not required to accept these findings. Indeed, as illustrated by the ALJ, Dr. Nystrom's findings on January 17 were disproportionate in severity to those in the preceding record. (R. at 65 – 71). As such, the ALJ's failure to adopt the extreme limitations findings in Dr. Nystrom's January 17, 2008 assessment was not in error and was supported by substantial evidence.

With respect to the findings made by DJM Psychological Services, Plaintiff claims the ALJ again erred in her treatment of the findings. Plaintiff complained to Ms. Mikita of a host of psychological issues, and Ms. Mikita made a number of findings – such as an inability to maintain employment due to anxiety. (R. at 65 – 71). However, this finding was predicated upon a number of subsidiary findings, such as the experience of anxiety around groups, fear of going out into public, some problems with memory, and issues with sustaining concentration.

Plaintiff fails to illustrate how the ALJ's hypothetical and residual functional capacity ("RFC") assessment did not adequately accommodate these limitations by considering only unskilled, low stress, light exertional employment, with limited lifting of no more than fifteen pounds, a sit/stand option, the ability to change positions as needed, no more than occasional kneeling or crawling, no excessive noise, unprotected heights, and dangerous machinery, only minimal interaction with co-workers, the general public, and groups of people greater than seven, and no work in a fast paced production environment.

Plaintiff further mentions that the ALJ failed to address Plaintiff's GAF score of 50. Yet, this score was awarded in the context of the above findings, and while the ALJ did not specifically mention the exact score, Plaintiff provides no evidence that the hypothetical and RFC assessment did not address the full import of the score. Plaintiff also fails to mention that Ms. Mikita considered Plaintiff's highest recent score to be a 75. Further, it should be noted that all of the findings made during the psychological assessment by Ms. Mikita were to be interpreted with caution, because Plaintiff was found to be prone to exaggeration. In light of all of the above, the court must conclude that the ALJ adequately dealt with the findings of Ms. Mikita at DJM Psychological Services.

The second part of Plaintiff's argument in this case focuses upon the ALJ's treatment of Plaintiff's subjective complaints of pain and limitation. (ECF No. 10 at 10 – 15). It has been established that an ALJ should accord subjective complaints the same treatment as objective medical reports, and weigh the evidence before her. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 122 (3d Cir. 2000). Serious consideration must be given to subjective complaints of pain and limitation where a medical condition could reasonably produce such symptoms. *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993). The ALJ is required to assess intensity and

persistence, and determine the extent to which it impairs a claimant's ability to work. *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). This necessitates a determination by the ALJ as to the extent to which a claimant is accurately stating the degree of his or her disability. *Hartranft*, 181 F.3d at 362. While pain itself may be disabling, and subjective complaints of pain may support a disability determination, allegations of pain suffered must be consistent with the objective medical evidence on record. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985); *Burnett*, 220 F.3d at 122.

Plaintiff claims that the ALJ failed to address Plaintiff's subjective complaints as outlined in the ALJ's decision. (ECF No. 10 at 10 – 15). However, after presenting a thorough account of Plaintiff's subjective complaints, the ALJ made a detailed analysis of the medical record to show the inconsistency between the severities of what Plaintiff complained of, and what was actually reported by Dr. Nystrom. (R. at 65 – 71). As discussed above, the ALJ provided sufficient explanation of her adoption of certain findings by Dr. Nystrom, while rejecting others. (R. at 65 – 71).

Further, the ALJ created a hypothetical question and RFC assessment which accommodated Plaintiff's subjective testimony, directly incorporating Plaintiff's own statement that she could lift up to fifteen pounds, and alternate between periods of sitting for a half hour to an hour while engaging in hobbies, and then standing to complete other tasks such as washing the dishes and letting out her dog. (R. at 65 – 71). Further, Plaintiff's ability to plan and host a party for thirty guests at her home is certainly evidence which tends to mitigate her complaints of inability to deal with large crowds. (R. at 65 – 71). Plaintiff's own testimony during her administrative hearing indicated that depending upon the size of a space and how well she knew the people she was dealing with, she could handle groups of up to thirty people before becoming

overwhelmed with anxiety. (R. at 31). Here, the ALJ's decision adequately accounted for Plaintiff's subjective complaints – explicitly outlining the complaints in detail – and properly determined that the complaints lacked credibility when compared with the medical record. (R. at 65 – 71).

## VI. CONCLUSION

Based upon the foregoing, the ALJ's decision was ultimately supported by substantial evidence from the record, and adequately accommodated Plaintiff's credible limitations. Accordingly, Plaintiff's Motion for Summary Judgment is denied, Defendant's Motion for Summary Judgment is granted, and the decision of the ALJ is affirmed. An appropriate order follows.

<u>s/ David Stewart Cercone</u>
David Stewart Cercone
United States District Judge

cc:   Terry K. Wheeler, Esquire
Paul Kovac
Assistant United States Attorney

(*Via CM/ECF Electronic Mail*)